UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
AURORA MARITIME INC.,                                            :
                                                                :       08 CV _____
                        Plaintiff,                              :
                                                                :
        - against -                                             :
                                                                :
GRANIT NEGOCE a/k/a                                             :
GRANIT NEGOCE S.A.R.L. a/k/a                                    :
GRANIT NEGOCE S.A. a/k/a                                        :
GRANITE TRADING,                                                :
                                                                :
                        Defendant.                              :
---------------------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, AURORA MARITIME INC., (hereafter referred to as "AURORA" or

"Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its

Verified Complaint against the Defendant, GRANIT NEGOCE a/k/a GRANIT NEGOCE

S.A.R.L. a/k/a GRANIT NEGOCE S.A. a/k/a GRANITE TRADING (hereinafter referred to as

"GRANIT" or "Defendant") alleges, upon information and belief, as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the

breach of a maritime contract of charter. This matter also arises under the Court's federal

question jurisdiction within the meaning of 28 United States § 1331 and the New York

Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et*

*seq.*) and/or the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

2.      At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity, organized under, and existing by virtue of foreign law and was at all

material times the registered owner of the motor vessel "FANARA" (hereinafter the "Vessel").

3.      Upon information and belief, Defendant GRANIT was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law with a place of business located at 44 Avenue de Valvins, 77212 Avon, France.

4.      By a charter party dated November 9, 2007 Plaintiff voyage chartered the Vessel to Defendant. The charter party called for the carriage of bulk barley from Santander, Spain to Agadir, Morocco. *A copy of the fixture recap dated November 9, 2007 on the Synacomex 90 Form is annexed hereto as Exhibit 1.*

5.      Plaintiff delivered the Vessel into the service of the Defendant on November 13, 2007 by way of a Notice of Readiness and has at all times fully performed its duties and obligations under the charter party. Defendant loaded onto the Vessel a total of 3,096.41 metric tons of bulk barley at Santander, Spain which was then safely carried from Santander to the port of Agadir, Morocco where it was discharged from November 26 – 27, 2007.

6.      The charter party obligated Defendant GRANIT to pay to Plaintiff a lump sum freight rate of $106,000 for the cargo carried aboard the Vessel; the charter party also provided for a demurrage rate of $3,400 per day of 24 consecutive hours or pro rate for time incurred by the Defendant for loading and/or discharging cargo to/from the Vessel beyond the time allowed ("laytime") in the charter party for GRANIT to load and/or discharge the cargo.

7.      A dispute has arisen between the parties regarding GRANIT's failure to pay in full all freight, demurrage and related charter party costs and expenses for its account. In particular, GRANIT owes to AURORA the following as reflected by AURORA's revised final freight invoice: a freight balance due of $49,474.13[1], plus further vessel time lost due GRANIT's

---

[1] Lumpsum freight of $106,000 was due plus $9,278.27 of incurred demurrage plus $40,427.82 of additional cargo bagging expenses incurred at load / discharge ports, *less* a $2,881.96 commission of 2.5% payable on freight demurrage, for a total of $152,824.13. GRANIT remitted one payment of $103,350 leaving a net unpaid freight balance of $49,474.13.

2

failure to timely load cargo upon the vessel and other related vessel costs all of which are due

and owing to Plaintiff under the charter party contract.

8.      The negotiations leading up to the fixture recap concentrated on the suitability of

Plaintiff's vessel to load bulk grains in Spain. Plaintiff, as vessel owner, specifically relied upon

the representation made by Defendant's surveyor that, based upon provision of required

documents and vessel information, the vessel would be permitted to load at Santander, Spain. As

a result of the parties' negotiations the following clause was inserted into the fixture recap:

> *REGARDING VSL'S SUITABILITY TO LOAD BULK GRAINS IN SPAIN PLS **DELETE***
> ***ALL OTHER RELEVANT CLAUSES AND REFERENCES MADE IN THE CP OR***
> ***IN THIS FIXTURE RECAP** AND READ CORRECT AS FOLL:*
> " NOTWITHSTANDING ANYTHING DIFFERENT MENTIONED IN THIS C/P,
> OWNERS CONFIRM THAT THEY HAVE CHECKED WITH CHARTS' AGENTS
> AND THEIR SURVEYOR AT LOADING PORT SANTANDER IF VSL CAN LOAD
> A FULL AND COMPLETE CARGO OF BULK BARLEY STOWING ABT 54' WOG
> SENDING THEM ALL THE REQUIRED DOCS / STABILITY FORMS / VSL'S
> GRAIN BOOKLETS AND DATA REQUIRED AND THE SURVEYOR REPLIED
> THAT THE VESSEL FOR HIM WITH THIS DATAS ARE OK.

*See Fixture Recap (page 4) and Charter Party, Ex. 1.*

9.      The material amendment made to the charter party by the clause set out in

paragraph eight (8), *supra*, superseded any and all other charter party clauses that touched and

concerned on the suitability of the vessel to load bulk grains at Spain and the consequences of

the vessel being determined to not be suitable to load bulk grains at Spain.

10.     When the vessel arrived at Santander, Spain, and after Plaintiff had issued its

Notice of Readiness, the local port authorities refused to allow the vessel to load on the basis that

the vessel's stability calculations did not comply with international standards and loading could

not be permitted. As a result, part of the intended cargo had to be loaded into bags that were then

placed atop the bulk grain that was loaded into the vessel's cargo holds. Notwithstanding the

clear import of the clause set out in paragraph eight (8), *supra*, the Defendant failed and refused

to be responsible for the costs incurred, and vessel time incurred, as a result of being required to

comply with the local port authority requirements.

11.     In addition to the foregoing relevant charter party clause, the parties' contract also

specifically contemplated that the Defendant would bear the expense and risk of cargo loading

and discharge. To wit, charter party clause 5 states, in relevant part, as follows:

Cargo shall be loaded, spout~~grab~~-trimmed and/or stowed at the expense and risk of
Shippers/Charterers ~~at the average rate of~~ *within 48 hours per weather working day of
consecutive 24 hours, saturdays, sundays, holidays excluded, even if used.*

Cargo shall be discharged at the expense and risk of Receivers/Charterers at the rate of
1,5000 metric tons per weather working day of 24 consecutive hours, *24 hours,
saturdays, sundays, holidays excluded, even if used.*

12.     As a result of GRANIT's breach of the charter party due to its failure to pay all

freight and demurrage due and payable, and its failure and refusal to be responsible for the costs

incurred, and vessel time incurred, Plaintiff has sustained damages in the total principal amount

of $70,871.25[2], exclusive of interest, arbitration costs and attorneys fees. *Attached hereto as*

*Exhibit 2 are copies of Plaintiff's laytime statements and unpaid revised final freight invoice*

*dated January 22, 2008.*

13.     Pursuant to the charter party, disputes between the parties are to be submitted to

arbitration in London subject to English law. AURORA specifically reserves its right to

arbitration of its claims against GRANIT. AURORA is preparing to commence London

arbitration against GRANIT.

14.     This action is brought in order to obtain jurisdiction over GRANIT and also to

obtain security for AURORA's claims and in aid of arbitration proceedings.

---

[2] In addition to the unpaid $49,474.13 revised final freight invoice the Plaintiff also seeks to recover $18,538.60 as the dollar equivalent of vessel time lost at load port incurred when the vessel was deemed unsuitable to load (daily running costs of $2,200 x 2.99 days ($6,578) *plus* daily net earnings of $4,000 x 2.99 days ($11,960.40)), plus $1,487.53 worth marine diesel oil consumed by the vessel during the delay at load port (.5 metric tons per day x 2.99 days = 1.495 metric tons x $995/metric ton = $1,487.53) plus $1,371 of costs incurred for labor (i.e., "gang") employed at the discharge port for disposing of bags used for cargo loading.

15.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| A. | Principal claims: | $70,871.25; |
| --- | --- | --- |
| B. | Estimated interest on claims-<br>3 years at 6% compounded quarterly: | $13,863.70; |
| C. | Estimated arbitration costs: | $10,000.00; and |
| D. | Estimated attorneys' fees and expenses: | $25,000.00. |
| **Total:** | | **$119,734.95.** |

16.    The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure[3], but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

17.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

---

[3] *See Affidavit of Kevin J. Lennon in Support of Prayer for Maritime Attachment attached hereto as Exhibit 3.*

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $119,734.95 belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

D.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

E.    That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

6

F.    That in the alternative this Court enter judgment against the Defendant on the

claims set forth herein;

G.    That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

H.    That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated:    New York, NY
          July 7, 2008

The Plaintiff,
AURORA MARITIME INC.

By: _____

Kevin J. Lennon
Patrick F. Lennon

LENNON, MURPHY & LENNON, LLC
420 Lexington Avenue, Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 - facsimile
kjl@lenmur.com
pfl@lenmur.com

7

## ATTORNEY'S VERIFICATION

State of New York   )
                    )       ss.:    City of New York
County of New York  )

 1. My name is Kevin J. Lennon.

 2. I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

 3. I am an associate in the firm of Lennon, Murphy & Lennon, LLC attorneys for the

Plaintiff.

 4. I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

 5. The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

 6. The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

 7. I am authorized to make this Verification on behalf of the Plaintiff.

Dated: New York, NY
   July 7, 2008

           Kevin J. Lennon

8

# EXHIBIT 1

FANARA_GRANIT_NEGOS.txt
TELIX MSG: A7206-00 10/11/07 19:28

NAVATRADE SA - GD DAY - PHONE: +30210 9213222


VICTOR / JOHN

RE MV FANARA / BARLEY SANTANDER - AGADIR  ACCT GRANIT CP DD 9.11.2007
-----------------------------------------------------------------------
WE ARE GLAD  TO CONFIRM THAT AS  PER  OWNERS' AND CHARTERERS' AUTHORITY
(SEE MESSAGES EXCHANGED) HAVE FIXED AM VESSEL IN FULL WILL ALL SUBJECTS
IN ORDER AS PER THE FOLLOWING:


F I X T U R E     R E C A P        (CP DD 9.11.2007)


ALL SUBJECTS ARE IN ORDER

- Performing vessel classed highest lloyds 100a1, or equivalent, VSL'S
  CLASS N.K. fully IACS member.
  VSL IS fully pandi covered by P+I CLUB:
  THE SOUTH OF ENGLAND PROTECTION AND IDEMNITY
  ASSOCIATION(BERMUDA)LIMITED
  charterers confirm above p+i club is approved by them.
  VESSEL IS fully in compliance with ism-code/regulations, with
  all relevant documents valid and on board for the duration of the voyage.

- Performing vessel fully grain fitted FOR A FULL AND COMPLETE CARGO OF
  BULK BARLEY STOWING ABT 54' CUB FEET WOG, AND SHE IS SUITABLE FOR GRAB
  DISCHARGE AS FAR AS THIS TYPE (SINGLEDECKER) CAN BE. VSL HAS NO OBTACLES
  IN HOLDS VSL HAS ONLY PERMANENT STEEL CARGO BATTENS FITTED IN
  HOLDS (SEE PHOTOS AS ATTACHED) VSL HAS NOT BOX HOLDS.
  VSL IS SINGLEDECKER AND SHE CAN LOAD GRAINS AS PER SOLAS 74 WITH
  GRAINBOOKLETS VALID AND ON BOARD FOR THE DURATION OF THE VOYAGE.

- The requirements of the international safety management ISM code are hereby
  incorporated into the terms of this charter party.

- BIMCO ISM CLAUSE TO APPLY

- DOC AND ISM CERTS AS ATTACHED.

- Owners confirm and guarantee that all vessels cranes/gear/derricks are in
  GOOD working order. Any time lost on account of breakdown of same at
  discharge port(s) shall be for owners account and ACTUAL time lost shall not
  count as laytime PRORATA TO THE NBR OF DERRICKS AFFECTED.

- OWNERS ADVISE FOLL:
  1. Owners & managers full style:
     OWNERS FULL STYLE:AYRORA MARITIME INC
     Managers: MASTROGIORGIS SHIPPING PIRAEUS
     7 , EFPLIAS STREET
     185 37 PIRAEUS, GREECE
     Tel: 0030 210-4184025,Fax;0030-210-4537029

  2. Class certificate:ISSUED AT 11/10/2007 VALID TILL 26.06.2012
     CLASS CERT AS ATTACHED

  3. Pandi certificate:ISSUED AT 22.02.2007 VALID TILL 20.02.2008
     P+I CERT AS ATTACHED

FANARA_GRANIT_NEGOS.txt

4. Position/itinerary/best eta load:
   COMPLETED DISCHARGING AT LORIENT ON 9.11.2007 ETS 10-11 NOVEMBER 2007
   WP AGW, ETA LOADPORT 12-14 NOVEMBER 2007 WP AGW.

5. Last 3 cargoes:STARTING FROM LAST:BULK DAP/STEELS/STEELS

6. ISM registration number:3HO-1961SMC(SMS0833003)
   SMC CERT AS ATTACHED

7. Expected intake and draft:ABT 3000-3100 MTS DEPENDING ON THE
   ACTUAL STOWAGE FACTOR OF THE CARGO/DRAFT MAX 5.66 METERS

8. Full description of vessel:AS BELOW

MV 'FANARA' EX 'AGHIOS SYMEON' EX 'CHEMI MOON' - SINGLEDECKER
FLAG: ST. VINCENT AND THE GRENADINES
3,595 MTS DWAT ON 5.660M SUMMER
3,469 MTS DWAT ON 5.543M WINTER
BLT OCTOBER 1982 JAPAN - LOA 91.91M, BEAM 14.03M,
2HO/2HA MCGRS HACOVERS
HAOPENINGS: NO1 20,15M X 8M - NO2 20,15M X 10,20M
GR/BL 168.000 / 164.591 CUFT.
DERICKS 2 X 20 TONS + 2 X 3 TONS
GRT2,584 / NRT1,402

CLASSED N K K (IACS)
FULLY P+I COVERED
=ALL DETAILS ABOUT WOG=

9. Bank details and beneficiary for freight remittance: REVERTING ON MONDAY

For,-

- Negotiations & fixture and all related details to remain strictly private &
  confidential at all times.

- Charterers : Granit Negoce

- Owners : AURORA MARITIME INCL C/O VSL'S MANAGERS MESSRS MASTROGIORGIS
  SHIPPING EFPLIAS 7 PIRAEUS GREECE

- Load/Discharge port(s) Santander 1gsb always afloat /Agadir 1-2 gsb always
  afloat

- 1 SAFE BERTH AT LOADING

- 1/2 SAFE BERTH(S) AT DISCHARGE PORT AS PER SYNACOMEX

- REGARDING VSL'S SUITABILITY TO LOAD BULK GRAINS IN SPAIN PLS
  DELETE ALL OTHER RELEVANT CLAUSES AND REFFERENCES MADE IN THE
  CP OR IN THIS FIXTURE RECAP AND READ CORRECT AS FOLL:
  ''NOTWITHSTANDING ANYTHING DIFFERENT MENTIONED IN THIS C/P,
  OWNERS CONFIRM THAT THEY HAVE CHECKED WITH CHARTS' AGENTS AND THEIR
  SURVEYOR AT LOADING PORT SANTANDER IF VSL CAN LOAD A FULL AND COMPLETE
  CARGO OF BULK BARLEY STOWING ABT 54' WOG SENDING THEM ALL THE
  REQUIRED DOCS / STABILITY FORMS / VSL'S GRAIN BOOKLETS AND DATA REQUIRED
  AND THE SURVEYOR REPLIED THAT THE VESSEL FOR HIM WITH THIS
  DATAS ARE OK.

- Cargo: Full and complete cargo of bulk barley stw about 54' wog

- Ows confirm that they will pass by email/fax ort telex to the Chtrs'agents
  Page 20

FANARA_GRANIT_NEGOS.txt
at loading port and latest 48 hrs before arrival of the vsl, the stowage
plan and if any the breakdown of every holds with the intake
for each one.

- Laycan 12/17 November 2007

- VSL'S  POSITION AND ETA SANTANDER : VSL COMPLETED DISCHARGING
  ON 9.11.2007 IN LORIENT - OWNERS HEREBY GIVE NOTICE ON FIXING
  FOR VSL'S ETA SANTANDER ON 12/14 NOV 2007 WP AGW UCE.

- No notice OF READINESS TO BE GIVEN before beginning of laycan and
  acceptable as per cp terms and subject to the full seaworthiness of the
  vessel.

- Load/discharge 48 hrs/1500 mt pwwd 24 cons hrs -sshex eiu -non reversible-
  bends.... fri5pm-mon8am

- NOTICE FOR VSL'S ETA LOADPORT TO BE GIVEN ON FIXING THEN DAILY

- at loading port: notice of readiness to be tendered during local office
  hours on weekdays from Monday till Friday both included, and time to start
  counting 14 hours same day if validly tendering before 1200 hrs, owise 08.00
  hrs next working day after validly tendering notice of readiness after 1200
  hrs, owise as per synacomex pro-forma charter party.

- At discharge port : notice of readiness to be tendered during local office
  hours on weekdays from Monday till Friday both included, and time to start
  counting at 0800 hrs on the next working day, if validly tendering before
  1200 hrs, owise 14.00 hrs next working day after validly tendering notice
  of readiness after 1200 hrs, owise as per synacomex pro-forma charter party.

- In case of strong wind, swell, rain ,snow or other cases of force majeure
  (impossibility to load and/or discharge AT THE BERTH VSL IS INTENDED TO
  LOAD OR DISCHARGE), at loading and/or discharging
  port laytime will not count. These periods will be included in the SOF
  and/or in any official docs which to be considered in force in the c/p
  for the laytime calculation.

- Freight usd 106.000.- lumpsum fiospoutgrabtrimmed

- Owners to issue freight invoice as follows,-
  1. On company headed letter paper
  2. Owners to fax us a copy to the Chtrs'broker
  3. I m p o r t a n t ! Owners to mail us the original

  Messrs : (charterers name)
  C/o name of the broker

  Freight invoice to include freight, less commission

- Freight payable 100% within 3 banking days after signing and releasing bills
  of lading marked only 'FREIGHT PAYABLE AS PER CP' (or in charterers option
  'FREIGHT PREPAID') and 'CLEAN ON BOARD', into owners nominated bank account,
  less total commissions ONLY, (HAVE FREE DESPATCH BENDS)

- In case the charterers exercise the option to issue freight
  prepaid bills of lading, owners have the option to retain the
  original bills of lading in agents custody till charterers' first
  class european bank confirm to owners' bank irrevocable freight
  transfer (less agreed deductions).
  Upon receipt of such confirmation owners to immediately authorize
  the release of the bills of lading by sending a telex or fax to the
  loadport agents.

Page 21

FANARA_GRANIT_NEGOS.txt

- Freight deemed earned upon shipment vessel and/or cargo lost or not lost.

- Demurrage usd 3400 per day prorate
  Free despatch bends.

- Charterers agents bends.
  agents in Santander:
  COBASA
  phone    34  942 369 389
  fax          34 942 369 315
  email: cobasa@cobasa.net

- AGENTS AT AGADIR ARE SOMATIM
  Phone 212 4884 0304
  fax        212 4884 0032
  email: infor@somatime.ma

- Vessel's holds to be clean, dry, free of smell and suitable to load the
  described cargo prior loading.

- Vessel suitable for grab loading and grab discharging AS FAR THIS
  TYPE OF SINGLEDECKER CAN BE , but no cargo shall be
  loaded in places unaccesible to grabs, such as manholes, deeptanks,
  sidetanks and wingtanks. (SEE ALSO VSL'S PHOTOS ATTACHED)

- Any taxes and/or dues and/or charges on the cargo to be for charterers
  account. Same on vessel and/or freight to remain for owners account.

- Dock dues or river mooring dues if any to remain for owners account.

- Quay dues in Algeria or Magreb/Arab countries at load and/or disch port to
  be for owners account, being understood that these quay dues are asessed on
  vessel's grt and quantity of cargo operated.

- War risk insurance premium, if any, to remain for owners account.

- Any extra insurance on cargo due to vessel's age and/or flag to be for
  charterers account.

- PROVIDED CHARTERERS WILL LOAD A FULL CARGO AS ABOVE THEN,
  Bagging and/or strapping and/or lashing and/or securing etc etc of the
  cargo, if any, to be for owners time and expenses.
  In this case, these operations to be in accordance with the official rules
  of the loading port and international regulations

- Should no original bsl be available at disport or in consignees/receivers
  hands, then if required by chrs, ows agree to discharge the cargo against a
  faxed letter of indemnity duly issued on charterers headpaper as per ows
  usual pandi wording, signed and stamped by the charterers only, without a
  bank guarantee being required. This loi will be in accordance with the CP
  and ENGLISH LAW to be applied. The LOI shall automatically become null and
  void against presentation of ALL of three original bsl duly accomplished. In
  any case, if bsl not at disport, owners n e v e r to allow discharge without
  charterers clear written instructions.

- Owners guarantee that the performing vessel has not carried meat and
  bonemeal for the past 12 months.

- Chrts have the liberty to fumigate the cargo for their account on board the
  vessel either during loading, or after completion of loading or before or
  during discharge and actual time used to count as laytime as per charter

Page 22

FANARA_GRANIT_NEGOS.txt
party. master/ows not to clause bls by reason of such fumigation.
crew to stay on board during fumigation provided INTERNATIONAL AND
local/health regulations permit.
alternatively, if crew refuse to stay on board although local/health
regulation permit, owners to pay crew accomodation and expenses ashore and
time lost due to this to be for ows account. also owners/master certify that
the vessel is in all respects capable and agreeable to 'in transit
fumigation' with aluminium phosphine/fostoxin or other approved product.
master to be fully advised of fumigation method employed and to confirm
understanding of all safety precautions.

- In case that for letter of credit purposes the charterers ask to change the
  signed bsl, the following procedure shall apply; all original bsl to be
  marked "null and void" and these bsl to be sent by the charterers to agents
  in France nominated by the owners OR CHARTERERS IN OWNS' OPTION.
  the load port agents will fax to the
  owners for their approval the draft of the new bsl to be issued.
  IT IS UNDERSTOOD THAT CHARTERERS WILL NOT CHANGE VITAL ITEMS IN THE NEW
  BS/L WHICH IN ANY CASE WILL BE SUBJECT TO OWNERS' FINAL APPROVAL.
  Upon receipt of all these "null and void" original bsl by the agents in
  Paris, WHO WILL SEND THE NULL AND VOID BS/L BY COURRIER TO OWNERS'
  OFFICE IN PIRAEUS ADVISING ALSO THE AIR WAY BILL NBR and after receipt
  of owners approval of the new sett bsl draft, load
  port agents will issue, sign & stamp the new set of bsl and forward same to
  the charterers.

- Master has the right to reject any cargo which cannot be signed for as clean
  on board, and such cargo to be replaced by sound merchandise to his
  satisfaction in cooperation with the surveyors
  Owners accept to sign the bsl "Clean on board"

- ''Cargo quantity at both ends  to be established as per custom of
  the port, BUT In case of any discrecancy  Master has the right
  to do a draft survey's and issue a Letter of Protest''.

- ARBITRATION IN LONDON ENGLISH LAW TO APPLY

- COMMISSIONS: 2,50% total fdd, including charterers' address
  commission + 1.25PCT TO NAVATRADE SA

- All other terms and conditions as per Charterers proforma
  synacomex 90 charter party, (FILE REF 01475 MARTIGUES DATED 25.1.2005)
  (see attachement) AMENDED AS FOLL:

- TO MAKE ALL RELEVANT ALTERATIONS, AMENDMENTS, DELETIONS
  AND INSERTIONS AS PER MAIN TERMS AGREED.

- LINE 20 AMEND TO READ '.... SHALL PROCEED DIRECT TO AGADIR
  ....ETC ETC AS AGREED IN MTERMS.

- FREIGHT PAYMENT TO BE AMENDED AS AGREE 100 PCT FREE DESPATCH
  (SO DELETE DEDUCTION FOR DESPATCH... as agreed in mterms)

- TAXES DUES TO BE AMENDED AS AGREED IN MTERMS

- LINE 39 AMEND TO READ ''.... UNDER MASTER'S DIRECTION AND SUPERVISION.
  SHIPPERS' AND/OR ....'' etc etc

- LINE 56 AFTER ''WAITING PLACE,'' INSERT ''WHETHER IN BERTH OR
  NOT'' etc etc as per syna

- CLAUSE 11 (FUMIGATION) TO BE AMENDED AS AGREED IN MTERMS

Page 23

FANARA_GRANIT_NEGOS.txt
- ARBITRATION IN LONDON ENGLISH LAW TO APPLY

- LINE 99 AT THE END AMEND TO READ ''TO SIGN THESE BILLS OF
  LADING CLEAN ON BOARD. MASTER HAS THE RIGHT TO REJECT ANY CARGO
  etc etc ... as per mterms agreed''

- GRAB DISCHARGE CLAUSE:
''VESSEL IS SUITABLE FOR GRAB DISCHARG AND GRAB DISCHARGING, AS
FAR AS A SINGLEDECKER OF THIS TYPE CAN BE (SEE ALSO ATTACHED
PHOTOS), BUT NO CARGO SHALL BE LOADED IN PLACES UNACCESSIBLE TO
GRABS, SUCH AS MANHOLES, DEEP TANKS, SIDE TANKS AND WING TANKS.
IN CASE OF PRESENCE OF SECOND DECKS, GRAIN FEEDERS, EXTENSION,
FRAMES, IN THE HOLDS OF THE VESSEL AND IN CASE THE VESSEL IS NOT
FULLY SINGLEDECKER, CHARTERERS REQUEST THAT DISCHARGING IN THE
UNACESSIBLES PLACES IN THE HOLD(S), SWEEPING AND MANUAL CLEANING
OPERATIONS BE DONE BY THE CREW, OR IF NOT ALLOWED BY LOCAL RULES
OF PORT AUHTORITIES OF THE DISCHARGING PORT SAME TO BE DONE BY
THE STEVEDORES. IN THIS CASE, EXTRA COSTS (IF ANY) OF
DISCHARGING, SWEEPING,OR CLEANING THE ABOVE MENTIONED UNACESSIBLE
DIFFICULT PLACES WILL BE FOR OWNERS ACT AND IF TIME LOST DURING
THESE OPERATIONS WILL NOT COUNT AS LAYTIME OR TIME ON
DEMURRAGE.''

- ADDITIONAL CLAUSES:
  ''NEW JASON CLAUSE, NEW BOTH TO BLAME COLLISION CLAUSE,
  PARAMOUNT CLAUSE, BIMCO STEVEDORE DAMAGE CLAUSE, PANDI
  BUNKERING CLAUSE ARE DEEMED TO BE INCORPORATED IN THIS
  CHARTER PARTY AND TO APPLY.''

- CLAUSE 30 DELETE AND INSERT WORDING AGREED IN MTERMS ALSO
  CLAUSE FOR VSL'S COMPLYING WITH I T F TO READ AS FOLL:
''OWNERS WARRANT THAT THE OFFICERS AND CREW ARE EMPLOYED IN
ACCORDANCE WITH THE TRADE UNION AGREEMENT OF VESSEL'S FLAG.
IN THE EVENT OF ANY DELAY TO THE VESSEL CAUSED BY
REASON OF ITF PROBLEMS RELATED TO THE TERMS AND CONDITIONS ON
WHICH MEMBERS OF THE OFFICERS/ CREW WERE EMPLOYED VESSEL, ACTUAL
TIME LOST HEREBY NOT TO COUNT AS LAYTIME OR TIME ON DEMURRAGE''

- CLAUSES 31 TO 46 TO BE AMENDED PROPERLY AS PER MTERMS AGREED.

- END OF FIXTURE RECAP

ATTACHED PLS FIND
- VSL'S PHOTOS AND POCKET PLANS
- DOCS AND CERTIFICATES
- CP-PROFORMA BASED CP DETS

THANKS FOR YOUR COOPERATION ON THIS NEW FIXTURE

BEST REGARDS/JOHN PEPPES
OFFICE:+30-210-92.13.222
AOH   :+30-210-80.71.422 - OR +30-222-90.67.068
MOBILE:+30-6-942.556.222

```
=== MESSAGE INFORMATION: [size: 6805376 bytes] [2] [M]
|ATTACH    BIN    FN=fanarafoto1.bmp            -    1 MB 7    2
|ATTACH    BIN    FN=fanarafoto2.bmp            -    1 MB 7    3
|ATTACH    BIN    FN=fanarafoto3.bmp            -    1 MB 7    4
|ATTACH    BIN    FN=fanarafoto4.bmp            -  748 KB 7    5
|ATTACH    BIN    FN=FANARA_POCKET_PLAN.TIF     -  125 KB 7    6
|ATTACH    BIN    FN=FANARA_POCKET_PLAN1.TIF    -   47 KB 7    7
|ATTACH    BIN    FN=FANAR_GRAN_PROF_CP.pdf     -  487 KB 7    8
```

```
                                    FANARA_GRANIT_NEGOS.txt
|ATTACH    BIN      FN=FAN_CERT_CLASS.TIF                       -   435 KB 7      9
|ATTACH    BIN      FN=FAN_CERT_ISSC.TIF                        -   114 KB 7     10
|ATTACH    BIN      FN=FAN_DOC.TIF                              -    88 KB 7     11
|ATTACH    BIN      FN=FAN_HM_PANDI.TIF                         -    28 KB 7     12
|ATTACH    BIN      FN=FAN_HM_PANDI2.TIF                        -   250 KB 7     13
|ATTACH    BIN      FN=FAN_PANDI.TIF                            -   140 KB 7     14
|ATTACH    BIN      FN=FAN_SMC.TIF                              -   120 KB 7     15
|=== END
|============================================ System notice  10/11/07 19:34:44
|LgINT ref #=1011_192802
|From:Navatrade S.A. <navatrad@otenet.gr>
|To..:chartering@megashipping.com
|Sent:Sat, 10 Nov 2007 19:28:02 +0200
|Subj:LgINT Message (REF:07A720600)
|Smtp:250 2.0.0 lAAHS25w024209 Message accepted for delivery
|**ATTENTION**: Status 'S' means submitted to Internet (with above SMTP id)

|==================================================================
```

This computer generated form is printed by authority of BIMCO/SYNACOMEX and COMITE CENTRAL DES ARMATEURS DE FRANCE. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original document as adopted by BIMCO shall apply. SYNACOMEX, COMITE CENTRAL DES ARMATEURS DE FRANCE and BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original SYNACOMEX document and this document.

**C O N T I N E N T   G R A I N   C H A R T E R P A R T Y**
adopted PARIS 1957 - amended 1990 - amended 1974 - amended 1990
by SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES
in cooperation with the French Chartering and S. & P. Brokers' Association
amended 1960,1974 & 1990 in agreement with COMITE CENTRAL DES ARMATEURS DE FRANCE
adopted by the DOCUMENTARY COMMITTEE of THE BALTIC AND INTERNATIONAL MARITIME COUNCIL

Code name: **SYNACOMEX 90**
copyright "SYNACOMEX" and "COMITE CENTRAL DES ARMATEURS DE FRAN

**ORIGINAL**





NAVATRADE S.A.
SHIPBROKERS

*La Coruna, 9th. November 2.007*

| **Owners** | |
| --- | --- |
| | *Greece* |

1.   It is this day agreed between *Messrs. AURORA MARITIME INCL. - C/O vdj's managers Messrs. M.STROGIORGIS SHIPPING - 7, Effplias Street - 185 37 Pir*

**Vessel**   Owners of the *M.V "PANAMA" EX "AGHIOS SYMEON" EX "CHEMI MOON"*   of  *2.584/1.402*tons gross/nett   Registered and classed

*as described in additional clause 36*                 ~~carrying about~~              ~~tons deadweight cubic metres of bunkers~~

*now   trading and position as per additional clause 36                and expected ready to load* ~~about~~   *not before. No notice of readiness to be given before of layca*
*and accupable us per ep terms and subject to the full seaworthiness of the vessel.*
*and   Messrs. GRANIT NEGOCE, S.A.*                                                       as Charterers.

**Charterers**
**Loading port(s)**   2.   That the said vessel being tight, staunch and in every way fit for the voyage, shall with all convenient speed proceed to *One good safe berth SANTANDER*

which in case of nanual port(s) Owners acknowledge as safe and suitable for this vessel and there load                    a) always afloat
                                                                                                                                ~~b) always afloat or not/by aground~~

**Cargo**   in such   *good and safe berth, dock, wharf or anchorage* as Charterers or their Agents or Shippers may direct a full and complete cargo of ~~about~~ ~~and/or maize and/or rye~~
~~and/or~~   *bulk barley stowing about 54' without guarantee*                       ~~metric tons~~   ~~in bulk (5 % more or less in Owners' option)~~
~~Shippers have the option of using~~ ~~a second safe berth. The time for shifting between the two berths shall count as laytime, but shifting expenses (including tug for vessel's~~
~~account. Owners shall provide and install at their risk and expense and on their time all that is required for safe stowage of grain according to local and international~~
regulations.
The cargo shall not exceed what the vessel can reasonably stow and carry over and above her bunkers, apparel, stores, provisions and accommodation. The whole cargo
shall be carried and stowed under deck. All cargo on board to be delivered.
~~Furthermore, if Owners have been specifically agreed the following shall apply:~~
~~Charterers shall supply for stowage purposes a quantity of bagged cargo not exceeding ----- per cent, which shall be stowed in their risk and expense. The number of~~
~~bags, equal for each Bills of Lading, to be loading, on vessel and Owners, unless case or fraud be proved.~~

3.   Being so loaded, the vessel shall proceed  *direct*  ~~with all convenient speed direct~~  to  *AGADIR - one or two safe berth (s)*

**Discharging port(s)**                                                                                                                                            a) always afloat
                                                                                                                                                                      ~~b) always afloat or not/by aground~~

which in case of named port(s) Owners acknowledge as safe and suitable for this vessel, and there discharge the cargo

in such  *good and*   safe berth, dock, wharf or anchorage as Charterers or their Agents or Receivers may direct. Receivers have the option of using a second safe berth. The time



ORIGINAL

**Freight**

for shifting between the two berths shall count as laytime, but shifting expenses shall be for vessel's account.

4.   The freight agreed under this Charterparty shall be *United States dollars 106.000.- lumpsum flatportgrabinimmed.*

~~per ton of 1.000 kilos~~   *freepnigrabinimmed*   ~~consist Bill of lading weight  less 0.50 per cent~~ and shall be deemed earned *upon shipment* ~~stowage is totalled on board,-~~

~~prepaid~~ discountless and non returnable.

vessel and/or cargo lost or not lost. The freight shall be paid as follows:  *100% within 3 banking days after signing and releasing bills of lading marked only "FREIGHT PAYABLE AS PER CP" for in charterers option "FREIGHT PREPAID") and "CLEAN ON BOARD", into owners nominated bank account, less total commissions only.*

In case the charterers exercise the option to issue "FREIGHT PREPAID" bills of lading, owners have the option to retain the original bills of lading in agents custody till charterers' first class european bank confirm to owners bank irrevocable freight transfer (less agreed deductions).

Upon receipt of such confirmation owners to immediately authorize the release of the bills of lading by sending a telex or fax to the landport agents. ~~All charges not later to be to the enger shall be for Charteres/ownsaccount and shall be for Charteres/Owners account.~~ Any taxes and/or dues and/or charges on the cargo to be for charterers' account. Some on vessel and/or freight to remain for owners account.

5.   Cargo shall be loaded, spoutgrab/trimmed and/or stowed at the expense and risk of Shippers/Charterers ~~at the average rate of~~ within 48 hours per weather working day of 24 consecutive hours, saturdays, sundays, holidays excluded, even if used.

Cargo shall be discharged at the expense and risk of Receivers/Charterers at the average rate of 1.500 metric tons per weather working day of 24 consecutive hours, saturdays, sundays, holidays excluded, even if used.

Laytime for load/discharge to be non-reversible.

Stowage shall be under Master's direction and supervision. ~~responsibility~~ Shippers' and/or Charterers' representatives have the right to be on board the vessel during loading, discharging

or lightening for the purpose of inspecting the cargo and/or weighing. Charterers and Owners are allowed to work overtime, such expenses shall be for account of the party ordering same. If ordered by Port Authorities, overtime shall be for Charterers' account. Overtime services rendered by ship's crew shall be in all cases for Owners' account.   ~~weather permitting~~

6.   At port of loading, laytime shall not count before 8.00 a.m. on the 17th. November 2.007   and in any case not before the date notified by the 10 days notice as per clause No.7  *No notice of readiness to be tendered before the laydays.* . Should the vessel's notice of readiness not be validly tendered as per cla 8 before 09.00 hours on the   17th. November 2.007

Charterers shall have the option of cancelling this charter at any time thereafter, but not later than one hour after the notice is validly tendered.

7.   Master and/or Owners shall give 10 ~~-----days event the notice~~   days   notice   on fixing then daily of vessel's expected readiness to load to: loadport agents. and MEGA SHIPPING, S.L. for onward transfer to the charterers. Owners confirm that they will pos by email/fax or telex to the clients'agents at loadport port and latest 4 before arrival of the vsl, the stowage plan and if any the breakdown of every holds with the intake for each one Similar notices to be given at discharging.

Master and/or Owners shall give them prompt advice of any substantial change in vessel's position.

8.   Vessel's written notice of readiness to load   and/or discharge   shall be tendered at the office of Shippers/Charterers/Receivers or their agents   during local office hours

ORIGINAL



weekdays from Monday till Friday both included    between 08.00 and
12.00 hours on all days except Saturdays, Sundays and Holidays and between 08.00 hours and 12.00 hours on Saturdays, unless a HolidaysSuch notice of readiness shall
be delivered when vessel is in the loading or discharging berth and in all respects ready to load/discharge. At loading port Shippers/Charterers or their Agents have the
privilege to inspect vessel's holds and reject the notice when holds are not clean, dry, odourless and in all respects ready to receive the cargo.
In case of disputes, an independent surveyor shall decide about vessel's readiness to load, Owners bearing the costs. If the rejection of notice of readiness is undisputed
or confirmed by surveyor the laytime will only start to count after the vessel is in all respects ready again when ready.

Only when the loading and/or discharging berth is unavailable, Master may warrant that the vessel is in all respects ready and may tender notice of readiness to load
and/or discharge from any usual waiting place, whether in berth or not, whether in port or not, whether customs cleared or not.
Laytime at loadport shall commence at 14.00 hours if notice of readiness to load    and/or discharge is validly tendered at or before 12.00 hours and at 08.00 hours on the next
working
day if notice of readiness is validly tendered after 12.00 hours. Time used before commencement of laytime shall not count. Laytime    at loadport shall not count between 12.0
17.00 hours
on Saturdays/Fridays or 17.00 hours on days preceding a Holiday and 08.00 hours on the following working day, unless used even if used in which case half time actually used
shall count. Laytime at discharport shall commence at 08.00 hours on next working day after validly rendering notice of readiness before 12.00 hours, and time to start counting 14.00 hours n
working day after validly rendering notice of readiness after 12.00 hours. Laytime at discharport shall not count between 17.00 hours and 08.00 hours on Fridays or 17.00 hours on days
preceding a Holiday and 08.00 hours on the following working day, even if used.

Any delays caused by ice, floods, quarantine, or by cases of "force majeure" shall not count as laytime unless the vessel is already on demurrage.
When Master has tendered notice of readiness to load or discharge from a waiting place and vessel is subsequently found unready in application of the above provisions,
laytime or time on demurrage shall not count from the time the vessel is rejected until the time she is accepted. Additionally, any actual time lost on account of vessel's
obtaining free pratique or customs clearance shall not count as laytime or time on demurrage. At second or subsequent port(s) of loading or discharging, laytime or time
on demurrage shall resume counting from vessel's arrival within port limits, provided within local working hours, otherwise upon first resumption of work. vessel's arrival
at loading or discharging berth, if available, or from vessel's arrival at a usual waiting place, if berth is unavailable.
All ports any time lost shifting from waiting place to berth shall not count as laytime or as time on demurrage. Opening and closing of hatches to remain for owners time a
expenses.

Demurrage/
Despatch money

9.    Demurrage is payable by Charterers at the rate of    United States dollars 3.400 free despatch both ends    per day of 24 consecutive hours or pro rata.
Owners shall pay to Charterers despatch money for laytime saved in loading/discharging at the rate of
per day of 24 consecutive hours or pro rata.

Seaworthy trim

10.    If ordered to be loaded or discharged at more than one berth and/or port, the vessel is to be left in seaworthy trim to Master's reasonable satisfaction for the
passage between berths and/or ports at Charterers' expense at loading and at Charterers/Receivers' expense at discharging ports, and time used for placing vessel in seaworthy
trim shall count as laytime or time on demurrage.

Fumigation

11.    Charterers have the liberty to fumigate the cargo on board at loading and discharging port(s). For laytime used in loading/discharging at the rate of
that Owners have Crew as well as all other persons on board during inspection do not expose to any health hazards whatsoever. Charterers'
undertake to pay Owners all necessary expenses incurred because of the fumigation and time for thereby shall count as laytime or time on demurrage. When fumigation
has been effected at loading port and has been certified by proper surveyor or by a competent authority, Bills of Lading shall not be claused by Master for reason of fumiga-

This computer generated form is authority of SYNACOMEX and COMITÉ CENTRAL DES ARMATEURS DE FRANCE. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not clearly visible, the
original document as adopted by INTACT or all ships.  SYNACOMEX, COMITÉ CENTRAL DES ARMATEURS?    INTACT and INTACT assume no responsibility for any loss or damage caused as a result of    text/law between the original SYNACOMEX document and this document.

ORIGINAL



**Lights and gear**

having been detected in the cargo prior to anti-fumigation.  Charterers have the liberty to fumigate the cargo for their account on board the vessel either during loading, or .
completion of loading or before or during discharge and actual time used to count as laytime as per charter party. Master/Owners not to clause bill (s) of lading by reason .
such fumigation. Crew to stay on board during fumigation provided International and local/health regulations permit. Alternatively, if crew refuse to stay on board although
local/health regulation permit, owners to pay crew accommodation and expenses ashore and time lost due to this to be for owners account. Also Owners/Master certify that
vessel is in all respects capable and agreeable to "in transit fumigation" with aluminium phosphide/fosteth or other approved product. Master to be fully advised of
fumigation method and employed and to confirm understanding of all safety precautions.

12.    Whenever required, vessel shall supply free use of lights as on board but sufficient to carry on night work.
Provided described as geared, vessel, whenever required, shall supply free use of all cargo handling gear on board.    Owners confirm and guarantee that all vessels
*cranes/derricks are*    in good working order, with the necessary motive
power, and of runners ropes and slings as on board, Shore hands shall be used to drive the gear, at Shippers/Charterers/Receivers' account. Any time    ~~eventy~~    lost on
account of breakdown of    *same in discharge port (s) shall be for owners' account and actual time lost*    ~~vessels gear shall~~ not count as laytime    *prorata to the number o*
*derricks affected*    or time on demurrage and any stevedore standby time charges incurred thereby shall be for Owners'
account. *see additional clause nr.3)*

**Agencies**

13.    At loading port the vessel shall be consigned to *Charterers Agents: Messrs. COBASA – Phone: + 34 942 369 389 - Fax: + 34 942 369 315 - Email:*
*cobasa@cobasa.net*

Owners to put agents in sufficient funds for pro-forma d/a ensuring no delay to vessel's operations.
At discharging port, she shall be consigned to  *Charterers Agents: Messrs. SOMARITIME – Phone: + 212 4884 0384 - Fax: 212 4884 0032 – Email: info@somaritime.ma*
Owners to put agents in sufficient funds for pro-forma d/a ensuring no delay to vessel's operations.

**Extra insurance**

14.    Any extra insurance on cargo due to vessel's age and/or flag,    ~~and/or this~~    shall be for ~~Owners'~~ Charterers account ; ~~such extra insurance shall be covered by~~
~~Charterers for~~
~~Owners account and shall be deducted from settlement of freight. W/o risk insurance premium, if any, shall be for owners account.~~

**Brokerage**

15.    A brokerage of  2.50%    per cent on the gross amount of freight, deadfreight and demurrage earned, is due to: 2.50% Mega Shipping, S.L. for division with
others and including charterers address commission) and 1.25% due to Navimvale, S.A.

**Address Commission**
16.    ~~An address commission of 2 1/2 per cent on the gross amount of freight-deadfreight and demurrage earned is due to Charterers and to deducted from freight~~
~~deadfreight and demurrage.~~

**Arbitration**

17.    Any dispute arising out of the present contract shall be referred to Arbitration  *In London and English Law to apply*  ~~of Chamber Arbitrale Maritime de Paris – By~~
~~full agreement.    ~~(copy here).~~
~~The decision rendered according to the rules of Chamber Arbitrale and according to French Law shall be final and binding upon both parties. The right of both parties~~
~~to refer any disputes to arbitration cannot involve twelve months after date of completion of discharge or in case of cancellation or non performance, twelve months after the~~
~~cancelling date or per-claim, for if after the actual date of cancellation whichever is the later. Where this provision do not comply with the rules shall be deemed to~~
~~be waived and absolutely barred.~~

**Bills of Lading**

Clauses No. 13 to 29 inclusive, as printed overleaf, are deemed to be incorporated in this Charterparty.
18.    The Mater is to sign Bills of Lading as presented  *by the loadport agents*  without prejudice to the terms, conditions and exceptions of this Charterparty,  *and Master is*
*sign these bills of lading without any remark whatsoever. To sign these bills of lading "clean on board" Master has the right to reject any cargo which cannot be signed for as*

This computer generated form is printed by authority of SCANDICANE, and COMITE CENTRAL DES ARMATEURS " FRANCE. Any besides or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO and approved by BIMCO and NSF apply. SCANDICANE, COMITE CENTRAL DES ARMATEURS " ICE and BIMCO assume no responsibility for any loss or damage caused as a result of discrepancy between the original BIMCO approved document and this document.

This sample/or permission from is a third by authority of CHINACOMEE and COMITE CENTRAL DES ARMATEURS DE FRANCE. Any reproduction or deletion to the form that it by a brief, visible in event of any modification, being made by the prepublished text of this document, which is not clearly visible, the original document as adopted by SIMCO and HOME. BYNACOMEE, COMITE CENTRAL DES ARMATEURS DE FRANCE and SIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BYNACOMEE document and this document

**Refer**

**Deviation**

*"clean on board", and such cargo to be replaced by sound merchandise to his satisfaction in cooperation with the surveyors.* If the Master delegates the signing of Bills of Lading to his Agents, he shall give them authory to do so in writing, copy of which is to be furnished to Charterers.

~~Whereas bills of lading marked "Freight prepaid" are required, same shall be released by Owners immediately upon receipt of a telex from Charterers/Bank confirming that freight payable has been irrevocably transferred.~~

19.  Charterers have the right to refit all or part of this Charterparty, they remaining responsible for its due fulfilment.

20.  Deviation in saving or attempting to save life or property at sea or for bunkering purposes or any other reasonable deviation shall not be deemed an infringement of this Charterparty and the Owners shall not be liable for any loss or damage resulting therefrom.

**Lien and cesser clause**

21.  The Owners shall have a lien on the cargo for freight, deadfreight, demurrage, and average contribution due to them under this Charterparty. Charterers' liability under this Charterparty is to cease on cargo being shipped except for payment of freight, deadfreight, and demurrage and except for all other matters provided for in this Charterparty where the Charterers' responsibility is specified.

**Penalties**

22.  Penalty for non-performance of this charter shall be limited to the proved damages caused to one of the parties without exceeding the estimated amount of freight.

**Responsibilities and Immunities**

23.  1) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to this Contract and to any Bill of Lading issued hereunder.

When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

2) In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd, 1968 - The Hague - Visby Rules - apply, compulsorily, the provisions of the respective legislation shall apply.

4) Save to the extent otherwise in this Charterparty expressly provided, neither party shall be responsible for any loss or damage or delay or failure in performance hereunder resulting from Act of God, war, civil commotion, quarantine, strikes, lockouts, arrest or restraint of princes, rulers and peoples or any other event whatsoever which cannot be avoided or guarded against.



ORIGINAL

*Clauses 24 - 29 continuing in the following*

**ORIGINAL**

**General Ice clause**

**24.   Port of Loading**

a)   In the event of the loading port being inaccessible by reason of ice when vessel is ready to proceed from her last port or at any time during the voyage or on vessel's arrival or in case ice sets in the vessel's arrival the Captain for fear of being frozen in is at liberty to leave without cargo and this charter shall be null and void

b)   If during the loading the Captain, for fear of vessel being frozen in, ... deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for Owner's benefit ... whatsoever ...

c)   In case of more than one loading port, and if one or more of the ports are closed by ice, the Captain or Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere ... their own account ...

d)   This Ice Clause not to apply in the Spring.

**Amended Centrocon strike clause**

**25.** ...

**the New Jason Clause**

**26.** ...

**General average and**

... General average shall be adjusted according to the York/Antwerp Rules, 1974 but where the shipment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

**Both to blame**
**Collision clause**

**27.** If the liability for any collision in which the vessel is involved while performing this Charterparty falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

...

**War risks ("Voywar 1950")**

**28.**  1)   In these Clauses "war risks" shall include any blockade or any action which is announced as a blockade by any Government or by any belligerent or by any organised body, sabotage, piracy, and any hostile act ... by ... threatened ... revolution.

2)   If at any time before the vessel commences loading, it appears that performance of the contract will subject the vessel or her Master and crew or her cargo to war risks at any stage of the voyage ...

Owners shall be entitled by letter or telegram despatched to the Charterers, to cancel this Charter.

3)   The Master shall not be required to load cargo or to continue loading or to proceed on or to sign Bills of Lading for any adventure on which or any port at which it appears that the vessel, her ...

This container document form is printed by authority of ETHNOCRAFT of STANCOMEX DE FRANCE, ... BIMCO issues full responsibility for any loss or damage caused as a result of discrepancies between the original STANDARD/BCA document and this document.

The computer generated form is printed by authority of BIMCO, INTERTANKO and COMITE GENERAL DES ARMATEURS DE FRANCE. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO, INTERTANKO and COMITE GENERAL DES ARMATEURS DE FRANCE and BVCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO approved document and this document.

ORIGINAL

and crew or her cargo will be subjected to war risks. In the event of the exercise by the Master of his right under this Clause after part or full cargo has been loaded, the Master shall be at liberty either to c such cargo at the loading port or on proceed therewith, in the latter case the vessel shall have liberty to carry cargo for Owners benefit and accordingly to proceed to and load or discharge such other any other port or ports whatsoever, backwards or forwards, although in a contrary direction to or out of or beyond the ordinary route. In the event of the Master electing to proceed with part cargo under this freight shall in any case be payable on the quantity delivered.

9) If at the time the Master elects to proceed with part or full cargo under item 3, or after the vessel has left the loading port, or the last of the loading ports, if more than one, it appears that further po of the contract will subject the vessel, her Master and crew or her cargo, to war risks, the cargo shall be discharged, or if the discharge has been commenced, shall be completed, at any safe port in the vicinity of of discharge as may be ordered by the Charterers. If no such orders shall be received from the Charterers within 48 hours after the Owners have despatched a request by telegram to the Charterers for the of a substitute discharging port, the Owners shall be at liberty to discharge the cargo at any safe port which they may, in their discretion, decide on and such discharge shall be deemed to be due fulfilment of the of the contract. In the event of cargo being discharged at any such other port, the Owners shall be entitled to freight as if the discharge had been effected at the port or ports named in the Bill(s) of lading which the vessel may be ordered pursuant thereto.

10) a) The vessel shall have the liberty to comply with any direction or recommendation as to loading, departure, arrival, routes, ports of call, stoppages, destination, zones, waters, discharge, delivery o other wise whatsoever (including any direction or recommendation not to go to the port of destination or to delay proceeding thereto or to proceed to some other port) given by any Government or by any be or by any impartial body engaged in civil war, hostilities or warlike operations or by any person or body acting or purporting to act as or with the authority of any Government or Belligerent or of any such o body or by any committee or person having under the terms of the war risks insurance on the vessel, the right to give any such directions or recommendations. If, by reason of or in compliance with any such or recommendation, anything is done or is not done, such shall not be deemed a deviation.

b) If, by reason of or in compliance with any such directions or recommendations, the vessel does not proceed to the port or ports named in the Bill(s) of Lading or to which she may have been persons thereto, the vessel may proceed to any port as directed or recommended or to any safe port which the Owners in their discretion may decide on and there discharge the cargo. Such discharge shall be to be due fulfilment of the contract of affreightment and the Owners shall be entitled to freight as if discharge had been effected at the port or ports named in the Bill(s) of Lading or to which the vessel m been ordered pursuant thereto.

c) All extra expenses (including insurance costs) involved in discharging the cargo at the loading port or in reaching or discharging the cargo at any port as provided in items 4 and 5(b) hereof shall be the Charterers and/or cargo owners, and the Owners shall have a lien on the cargo for all extra expenses due under these items.

29   Clauses  29   to  48     inclusive, as attached, are deemed to be incorporated in this Charterparty.

The Charterers:                                                                                 The Owners:







ORIGINAL  :

## Additional Clauses

30) Performing vessel classed highest lloyds 100A1, or equivalent, vessel's class N.K.K. fully IACS member. Vessel is fully p and/ covered by P+I Club; THE SOUTH OF ENGLAND PROTECTION AND INDEMNITY ASSOCIATION (BERMUDA LIMITED), Charterers confirm above p+i club is approved by them. Vessel is fully in compliance with ism-code/regulation, with all relevant documents valid and on board for the duration of the voyage.

Owners warrant that the officers and crew employed in accordance with the trade union agreement of vessel's flag. In the event of any delay to the vessel caused by reason of ITF problems related to the terms and conditions on which members of the officers/crew were employed vessel, actual time lost hereby not to count as laytime or time on demurrage.

31) ISM clause as follows:

The requirements of the International Safety Management (ISM) Code are hereby into the terms of this charter party. From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charterparty, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charterparty, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

32) Performing vessel fully grain fitted, for a full and complete cargo of bulk barley stowing about 54' cubic feet without guarantee, and the is suitable for grab discharge as far as this type (singledecker) can be. Vessel has no obstacles in holds. Vessel has only permanent steel cargo battens fitted in holds. Vessel has not box holds. Vessel is singledecker and she can load grains as per Solas 74 with grainbooklets valid and on board for the duration of the voyage.

33) Vessel is suitable for grab loading and grab discharging, as far as a singledecker of this type can be, but no cargo shall be loaded in places unaccessible to grabs, such as manholes, deep tanks, side tanks and wing tanks, in case of presence of second decks, grain feeders, extension, frames, in the holds of the vessel and in case the vessel is not fully singledecker, chartererers request that discharging in the unaccessibles places in the hold (s), sweeping and manual cleaning operations to done by the crew, or if not allowed by local rules of port authorities of the discharging port same to be done by the stevedores. In this case, extra costs (if any) of discharging, sweeping, or cleaning the above mentioned unaccessible difficult places will be for owners' account and if time lost during these operations will not count as laytime or time on demurrage.

34) Provided charterers will load a full cargo as above then, bagging and/or strapping and/or lashing and/or securing etc etc of the cargo, if any, to be for owners time and expenses.
In this case, these operations to be in accordance with the official rules of the loading port and international regulations,

ORIGINAL ::



Notwithstanding anything different mentioned in this charter party, owners confirm that they have checked with charterers' agents and their surveyor at loading port santander if vessel can load a full and complete cargo of bulk barley stowing about 54° without guarantee sending them all the required docs/stability forms / vsl's grain booklets and data required and the surveyor replied that the vessel for him with this data are ok.

35) Upon completion loading, owners to ISSUE, FAX and MAIL THE ORIGINAL INVOICE as follows:

Messrs. GRANIT NEGOCE, S.A.
c/o
MEGA SHIPPING, S.L.
Alvaro Cunqueiro, 7 - 1°
15008 LA CORUNA (Spain)

Freight invoice to includes freight less commissions.

It's clearly understood by the Owners that the Charterers can only settle freight against issued faxed invoice.

36) MV "FANARA" EX "AGHIOS SYMEON" EX "CHEMM MOON" - SINGLEDECKER
FLAG: ST. VINCENT AND THE GRENADINES - 3.595 MTS DWAT ON 5.660M SUMMER
3.469 MTS DWAT ON 5.543M WINTER - BLT OCTOBER 1992 JAPAN - LOA: 91.91M - BEAM: 14.03M - 2HO/2HA MCGRS HACOVERS
HACPENINGS: NO1: 20.15M X 8M - NO2: 20.15M X 10.20M
GR/BL: 168.000 / 184.591 CBFT - DERRICKS: 2 X 20 TONS + 2 X 3 TONS
GRT: 2.584 / NRT: 1.492
CLASSED: N K K (DACS)                - ISSUED AT 11/10/2007 VALID TILL 28/08/2012
FULLY P+I COVERED: THE SOUTH OF ENGLAND PROTECTION AND INDEMNITY ASSOCIATION (BERMUDA LTD)    -    ISSUED AT 22/02/2007
VALID TILL 20/02/2008
=ALL DETAILS ABOUT WOG=

ISM REGISTRATION NUMBER: 3HD-19615MC (SMG9330003)

Owners & managers full style:
Messrs. AURORA MARITIME INC.
Managers: Messrs. MASTROGIORGIS SHIPPING - Elpilas 7 - Piraeus-Greece
1, G. Katsoundou Str. - Limasool - Cyprus

Expected intake and draft: abt 3000-3100 mts depending on the actual stowage factor of the cargo/draft max 5.65 meters
Last three cargoes starting from last bulk dap/steels/steels

ORIGINAL



Position/itinerary/best eta load:
Completed discharging at Lorient on 9th Nov 2.007 - ETS 10-11th. Nov. 2.007 - wp/agw - ETA loadport 12-14th Nov. 2007 - wp/agw.

37) Dock dues or river mooring dues, if any to remain for owners account.

38) Owners confirm and guarantee that the performing vessel is non-blacklisted for calling Arab countries and that the performing vessel fully complies with all Moroccan (or Algerian as the case may be) Authorities regulations.

39) Owners confirm and guarantee that all vessels cranes/gear/derricks are in good working order. Any time lost on account of breakdown of same at discharge port (s) shall be for owners' account and actual time lost shall not count as laytime prorata to the number of derricks affected.

40) Quay dues in Algeria or Magreb/Arab countries at load and/or disch port to be for owners account, being understood that these quay dues are assessed on vessel's grt and quantity of cargo operated.

41) Owners guarantee that the performing vessel has not carried meat and bonemeal for the past 12 months.

42) Master has the right to reject any cargo which cannot be signed for as "clean on board", and such cargo to be replaced by sound merchandise to his satisfaction in cooperation with the surveyors. Owners accept to sign the bsl "Clean on Board".
Cargo quantity at both ends to be established as per custom of the port, but in case of any discrepancy Master has the right to do a draft survey's and issue a Letter of Protest.

43) Vessel's holds to be clean, dry, free of smell and suitable to load the described cargo prior loading.

44) In case that for the letter of credit purposes the Charterers ask to change the signed bs/l, the following procedure shall apply; all original bs/l to be marked "null and void" and these bs/l to be sent by the charterers to agents in France nominated by the owners or charterers in owners option. The load port agents will fax to the owners for their approval the draft of the new bs/l to be issued. It is understood that charterers will not change vital items in the new bs/l which in any case will be subject to owners' final approval. Upon receipt of all these "null and void" original bs/l by the agents in Paris, who will send the null and void bs/l by courier to owners office in Piraeus advising also the air way bill nbr and after receipt of owners approval or the new set bs/l draft, loadport agents will issue, sign & stamp the new set of bs/l and forward same to the charterers.

45) Should no original bill of lading be available as discharpt or in consignees/receivers hands, then if required by charterers, owners agree to discharge the cargo against a faxed letter of indemnity duly issued on charterers headpaper as per owners usual pandi wording,signed and stamped by the charterers only, without a bank guarantee being required.This lol will be in accordance with the CP and English Law to be applied. This LOI shall automatically become null and void against presentation of all of three original bsl duly accomplished. In any case, if bsl not at dischport, owners NEVER to allow discharge without charterers clear written instructions.

ORIGINAL.



40) In case of **strong wind, swell, rain, snow or other cases of force majeure** (impossibility to load and/or **discharge at the berth vessel** is intended to load or discharge), at loading and/or discharging port laytime will not count. These periods will be included in the SOF and/or in any official docs. which to be considered in force in the c/p for laytime calculation.

47 New Both to Blame Collision Clause, Paramount Clause, Bimco Stevedore Damage Clause, P&I Bunkering Clause, are deemed to be incorporated in this charter party and to apply.

48) Cargo fixed by MEGA SHIPPING, S.L. acting as fixing brokers only. Negotiations and fixture and all related details to remain strictly private and confidential at all times.

# EXHIBIT 2

## TIME SHEET-LOADING PORT

| Voyage | VOY 73 SANTANDER-AGADIR |
|---|---|
| CP DD | MV FANARA/GRANIT CP DD 09.11.2007 |
| Quantity of Cargo | 3096.41 |
| Laycan | 12/17 NOVEMBER 2007 |
| Loading Rate | 1548 |
| Laytime Allowed | 2,000264856 |
| Demurrage | 3400 |
| Despatch | FREE DESPATCH |
| | |
| Vessel Arrived | TUE 13/11/2007 06:00 HRS |
| Nor Tendered | TUE 13/11/2007 08:00 HRS |
| Nor Accepted | TUE 13/11/2007 08:00 HRS |
| Load Commenced | WED 14/11/2007 08:00 HRS |
| Load Completed | SUN 18/11/2007 11:30 HRS |
| Vessel Sailed | SUN 18/11/2007 15:00 HRS |

LAYTIME STARTS TO COUNT AS PER CP FROM TUE 13/11/2007 AT 14:00 HRS

| Day | Date | Time Used | | Time NTC | | Time | Days | Remarks |
|---|---|---|---|---|---|---|---|---|
| | | From | To | From | To | | | |
| Tuesday | 13/11/07 | 14:00 | 24:00 | | | 10:00 | 0,42 | |
| Wednesday | 14/11/07 | 0:00 | 8:00 | | | 8:00 | 0,33 | |
| Wednesday | 14/11/07 | | | 8:00 | 12:00 | 0:00 | 0,00 | RAIN |
| Wednesday | 14/11/07 | 12:00 | 24:00 | | | 12:00 | 0,50 | |
| Thursday | 15/11/07 | 0:00 | 18:00 | | | 18:00 | 0,75 | VSL ON DEMURRAGE |
| Thursday | 15/11/07 | 18:00 | 24:00 | | | 6:00 | 0,25 | |
| Friday | 16/11/07 | 0:00 | 24:00 | | | 24:00 | 1,00 | |
| Saturday | 17/11/07 | 0:00 | 24:00 | | | 24:00 | 1,00 | |
| Sunday | 18/11/07 | 0:00 | 11:30 | | | 11:30 | 0,48 | LOAD COMPLETED |

| | |
|---|---|
| 4,7292 | Laytime Completed |
| 2,0003 | Laytime Allowed |
| 2,7289 | Demmurage in Days |
| 9278,27 | Demmurage. |

## #ΑΝΑΦ!

| | | |
|---|---|---|
| **Voyage** | VOY 73 SANTANDER-AGADIR | |
| **CP DD** | MV FANARA/GRANIT CP DD 09.11.2007 | |
| **Quantity of Cargo** | 3098,41 | |
| **Laycan** | 12/17 NOVEMBER 2007 | |
| **Discharging Rate** | 1500 | |
| **Laytime Allowed** | 2,064273333 | |
| **Demurrage** | 3400 | |
| **Despatch** | FREE DESPATCH | |
| | | |
| **Vessel Arrived** | SUN 25/1120/07 06:00 HRS | |
| **Nor Tendered** | SUN 25/11/2007 06:00 HRS | |
| **Disch Commenced** | MON 26/11/2007 13:45 HRS | |
| **Disch Completed** | TUE 27/11/2007 09:15 HRS | |
| **Vessel Sailed** | TUE 27/11/2007 | |

LAYTIME STARTS TO COUNT AS PER CP FROM MON 26/11/2007 AT 14:00 HRS

| Day | Date | Time Used | | Time NTC | | Time | Days | Remarks |
|---|---|---|---|---|---|---|---|---|
| | | From | To | From | To | | | |
| Monday | 26/11/07 | 14:00 | 24:00 | | | 10:00 | 0,42 | |
| Tuesday | 27/11/07 | 0:00 | 9:15 | | | 9:15 | 0,39 | |

| | |
|---|---|
| 0,8021 | Laytime Completed |
| 2,0643 | Laytime Allowed |
| 1,2622 | Despatch in Days |
| FREE | Despatch. |



**MASTROGIORGIS SHIPPING COMPANY LTD**

7, EFPLIAS STREET - 18537 PIRAEUS - GREECE
TEL: +30 1 4184026-8  FAX: +30 1 4637019
email: mastog1 @ Otenet.gr

Tuesday, 22nd January 2008

TO  : GRANIT NEGOCE
C/O MEGA SHIPPING SL, SPAIN

## Re: MV FANARA - GRANIT CP DD 9.11.2007

## REVISED FINAL FREIGHT INVOICE

| Charter Party | 09.11.2007 |
| Voyage | Voy 73 |
| Cargo Type | bulk barley |

| | | | |
|---|---|---|---|
| Freight lumpsum | | | 106.000,00 US $ |
| Demurrage at loading port | | | 9.278,27 US $ |
| | | **EXCH RATE** | |
| Plus additional expenses for bagging | (27,614.63 EURO ) | 1,464 | 40.427,82 US $ |
| Less Com on freight/demurrage | 2,50% | | 2881,96 US $ |
| Less freight received | | | 103.350,00 US $ |
| **BALANCE TO BE REMITTED TO OWNERS** | | | **49.474,13 US $** |

You are kindly requested to arrange the remittance to the following bank account:

HSBC BANK PLC
93, AKTI MIAOULI
185 35 PIRAEUS
GREECE
TELEX: 211788 MIDP GR
SWIFT: MIDLGRAA
FOR CREDIT THE ACCOUNT OF V.BULKERS SA
ACCOUNT NO. 001-048677-036
IBAN: GR21 0710 0010 0000 0104 8677 036

CORRESPONDING BANK IN NY
HSBC BANK USA NEW YORK
SWIFT: MRMDUS33
ABA : 021001088
FOR CREDIT THE ACCOUNT NUMBER 000-04779-1

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
AURORA MARITIME INC.,                                   :
                                                        :      08 CV _____
                            Plaintiff,                  :
                                                        :      ECF CASE
        - against -                                     :
                                                        :
GRANIT NEGOCE a/k/a                                      :
GRANIT NEGOCE S.A.R.L. a/k/a                             :
GRANIT NEGOCE S.A. a/k/a                                 :
GRANITE TRADING,                                         :
                                                        :
                            Defendant.                  :
-----------------------------------------------------------------------X

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut  )
                      )         ss: Town of Southport
County of Fairfield   )

        Kevin J. Lennon, being duly sworn, deposes and says:

        1.      I am a member of the Bar of this Court and represent the Plaintiff herein. I am

familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the

issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the

Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

### DEFENDANT IS NOT PRESENT IN THE DISTRICT

        2.      I have attempted to locate the Defendant, GRANIT NEGOCE a/k/a GRANIT

NEGOCE S.A.R.L. a/k/a GRANITE TRADING within this District. As part of my investigation

to locate the Defendant within this District, I checked the telephone company information

directory, as well as the white and yellow pages for New York listed on the Internet or World

Wide Web, and did not find any listing for the Defendant. Finally, I checked the New York

State Department of Corporations' online database which showed no listings or registration for the Defendant.

3.    I also located a website hosted at www.epis-centre.fr/m-negoce.htm that appears to be owned, operated and maintained by the Defendant and/or the corporate parent, or group, to which it belongs – Epis Centre. However, a review of that website does not appear to show any presence within this District. *Attached hereto as Exhibit 1 is a printout from the aforementioned website.*

4.    I submit based on the foregoing that the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

5.    Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendant.

6.    This is Plaintiff's first request for this relief made to any Court.

## PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

7.    Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Peterson (Siegel), Colleen McEvoy, Anne C. LeVasseur or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon

the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendants.

8. Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

9. To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ.

### PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

10. Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendant, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

### PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

11. Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process

is served through the next day, provided that process is served the next day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

## PRAYER FOR RELIEF TO TEMPORARILY SEAL CASE

12.    Upon information and belief, it is the practice of many law firms in the maritime bar to review the daily electronic docket sheet of the Southern District of New York for all maritime actions filed in the district and inform the defendant(s) named therein of any Ex Parte Orders of Attachment pending against them, thus defeating the purpose of the "Ex Parte" application.

13.    Upon information of belief, it is the practice of certain publications, Specifically, Tradewinds (*see* www.tradewinds.no) to publish the names of defendants named in Ex Parte Orders of Attachment, thus further defeating the purpose of the "Ex Parte" application.

14.    Upon information and belief, Tradewinds has very recently publicized the names of parties in Rule B proceedings, the amount of the attachments, and other details of the actions, thereby further defeating the purpose of the "Ex Parte" application. *See copYs of recent Tradewinds article annexed hereto as Exhibit 2.*

15.    Due to the nature of the claim and the identity of the Plaintiff, even if the Defendant's name and the name of the ship were to be redacted from the Complaint, an abundance of identifiable information would remain in the pleadings, which could easily be discerned by Tradewinds.

16.    The Courts within the Southern District of New York have an interest in preserving the efficacy of the Ex Parte Orders issued therein.

17.    The above interest supersedes the interest in maintaining a completely public docket, especially given that the public's access will only be limited temporarily until assets are attached and notice of attachment has been provided to the Defendant.

18.    Indeed, the public's access to Ex-Parte Orders of Maritime Attachment defeats their entire purpose, by depriving Plaintiffs of the element of surprise and potentially allowing Defendant to re-route its funds to avoid the attachment, thus making the attachment remedy hollow.

19.    For the foregoing reasons, Plaintiff requests that the Court issue an Order temporarily sealing the court file in this matter, including the Verified Complaint and all other pleadings and Orders filed and/or issued herein until the earlier of further notice of this Court or notification to the Court that property has been attached and the Defendant has been provided notice of attachment.

20.    This request is narrowly tailored to meet Plaintiff's needs. Once property is attached, the case should be unsealed, as the interest underlying sealing the case will have been largely eliminated.

Dated:        July 7, 2008
              Southport, CT

                                              Kevin J. Lennon

Sworn and subscribed to before me
this 7th day of July 2008.

Anne C. Lennon
Commissioner of Superior Court

# EXHIBIT 1

# Granit Négoce

GRANIT
NÉGOCE

| | **GRANIT NÉGOCE**<br><br>Achat vente de céréales principalement à destination du bassin méditerranéen.<br><br>Volume : 2,2 millions de tonnes de grains<br>Chiffre d'affaires : 338 ME<br><br>Direction:<br>François PIGNOLET<br>Jean-Philippe EVERLING | 27 Quai de la Fontaine<br>30900 NÎMES<br>**FRANCE**<br><br>Tél : 00 334 66 36 92 36<br>Fax : 00 334 66 21 16 01<br><br>Granit négoce |
|---|---|---|
| | **GRANIT ALGER<br>BUREAUX COMMERCIAUX<br>D'ACHAT DE CEREALES**<br><br>Direction - Smaïn BENAZOUT | Commercial development office<br>8, impasse du réservoir<br>16000 Hydra - ALGERIE<br>Tél. 00 213 21 48 16 19<br>Fax. 00 213 21 48 16 21<br>Smaïn Benazout |
| | **GRANIT HONGRIE**<br><br>Achat de céréales auprès des producteurs hongrois | Budapest H - 1123<br>Alkotas U 17.19<br>**HONGRIE**<br><br>Tél. 00 36 12 14 01 04<br>Fax. 00 36 12 14 01 03<br>Granit Hongrie |
| | **ITALIE** | Olivier Combes |

# EXHIBIT 2

TradeWinds 30 May 2008

## LEGAL

# Court keeps rule burden on owners

**Greek player Liquimar has lost an appeal over a far-reaching ruling.**

Andrew Guest — London



Liquimar of Greece has failed in its bid to overturn a ruling that a shipowner has to bear the commercial risk of a change in regulations during a charter.

The unanimous judgement from a London appeal court leaves Liquimar's owner, Dinitri Papadimitriou, facing a multimillion-dollar bill, although he may take the case to the House of Lords.

The ruling in Golden Fleece Maritime Inc and Pauline Shipping SA and ST Shipping & Transport Inc, upholding last year's judgement in the Queen's Bench Division of the commercial court, also has implications for both owners and charterers as the regulatory environment for shipping tightens and the speed of change increases.

At issue in the Liquimar case was how much to hold in the Marpol convention adopted in the wake of the Erika oil spill in 1999 affected the ability of two aframax tankers to comply with the terms of charters with ST Shipping, the subsidiary of Swiss trader Glencore.

The Marpol amendments came into effect in April 2005, when the charters still had 29 months to run, and required the carriage of heavy fuel oil in double-hull tankers with an exemption for double-sided tankers if they showed documentation from the flag state, which in this case was Liberia. The two tankers — the 94,049-dwt Elli (built 1995) and 94,007-dwt Frixos (built 1997) — were generally regarded as double-sided and not been chartered by ST Shipping as such. But they had a 2.5-metre-long section of hull where fuel tanks rather than ballast tanks formed the outside layer of the hull.

This think in their armour centred more directly about their classification as being double-sided until Lloyd's Register, asked to clarify the point, said they did not qualify for the flag-state dispensation — a judgement that Liberia followed.

Being ruled out of carrying heavy fuel at reduced the tankers' earnings potential as their shallow draught had made them ideal for trading at the lanning port of Banias Mediolaire.

Opportunities to carry alternative cargoes such as crude also became limited, particularly when the tankers slumped in late 2005.

Once it became clear the tankers were not Marpol-compliant and a substitute to Tiankes Energy of Hong Kong had been cancelled, ST Shipping withheld payment due under a profit-sharing agreement and, when Liquimar claimed, ST Shipping counter-claimed for loss of profit.

The "critical question", Lord Justice Longmore, one of the appeal judges, says is whether non-compliance with Marpol meant the owner was in breach of the charter after the entry into force of the amendment and this depended on the terms of the charterparties.

The Shellitters charterparty remained, as well as seaworthiness, the tankers to be fit to carry every petroleum products, to carry all necessary documents and certificates and to comply with all applicable conventions including specifically Marpol.

A secondary also referred to Marpol "as amended and extended", which meant, in the court's opinion, without the flag-state exemption the ships were in breach of the charter.

Ben Knowles of Clyde & Co, representing ST Shipping, says the judgement is a "brand-new

---

## IN BRIEF

### Woes afflicts close Turkish coal importer

Affiliates of Greek bulker owner Vesta have a changed Turkish coal importer fan from for $31.85m in damages after a 2005 incident in which coal in a handymax bulker cargo was not completely.

Along with Close Shipping & Trading, Erikson is a member of the Vidikan Group, controlled by Yannis Vlacho. The owners claim the shipper breached the charter by loading a dangerous cargo without prior notice and that it is liable for salvage and other costs.

On 9 December 2005, the charter's time-chartered 25,915-dwt Dynasty Chronicles built 2004, suffered an explosion and fire on the forehold in the Black Sea following loading of a shipment of coal that had been loaded at Kizincy.

While the owner attempted and successfully argued the shipper could not be proved, he says the authorities denied the ship's request permission to berth in Navodari, forcing a salvage contract with the Turkish Coastal Safety Salvage Administration, that ship was beached and expressly by Navodari, the owner claiming an extra burden.

Salvors and cargo interests are settled the vessel. After the owners parties securely won a stand-off, the ship declared not maintaining cargo as intended by battery's charges as paid yard for saltative work.

The Valli Dynasty was born under charter from the owner to Denmark's TKS Shipping, which had subchartered it to till Keren to carry the 48,000-tonne load at a rate of $30 to $33 per tonne for delivery at Turkish Black Sea ports.

The shipowner the various London authorities and their failure in dispute but the ship owner as barrister, on a benefit of payment, the $44,000-dwt tanker claims the $16.8m-sandew-$24 per yard for the legal fees and behoof of summons Slim is expected.

The claim is not the first in salvage-related mess; counterpoint is the hull. In October 2004, the interest reportedly the Epanema owner of a handymax panamax the 56,000-dwt aframax-built 1991, and market value as Long Beach, and won an order to freeze over $35m in the last hour's over such an incident.

### Lawyers secure $2.6m belonging to Cargill

New York lawyers scored a scoop for trader Cargill in their bid to stop a charter owner use Cargill claims making a dispute between a subsidiary of Greek-based shipping Co (Guru) and Swiss-based Cargill.

Chiefs Freppe on the Shippers, Cargill has taken Cargill to arbitration in London, claiming the matter the credit was $1.3m while the owner the crater a 565,500-per-day time charter of the 77,585-dwt on his 30-dwt 2004, operation 15 August 2007. The claims arose until a 235 days and the allegedly that they would correspond in a month's earnings, Cargill claims Cargill was "cartel" in payment during the dispute, payment making disputed for deduction over a long period.

## 18th–19th September 2008
## London, United Kingdom



## BioFuels
## Maritime Trade & Transport

The definitive conference offering a unique insight into the vast potential of this developing maritime cargo

Key conference to include:
• Role and impact of biofuels on the global economy
• Ocean transport of biofuels and feedstocks
• Legal and regulatory considerations
• Port and terminal requirements
• Achieving cost-effective biofuels and biomass supply chains
• Addressing the impact: EU and US taxes and subsidies
• Pricing and trading

mail@navigatconferences    www.navigatconferences.com
Email: conferences@navigat.com    Tel +44 20 7369 73025

### Samsung Logic tries fund over frozen funds

South Korean charterer Samsung Logic Corp is claiming a Chinese handysize owner's refusal to hand cargo as a stowed part could sent it over $3m.

Samsung Logic, caught in the middle between money and subcharterers, says some $300,000 of its assets have already been frozen in New York by South Korean were related to a same owner to the charter period of the 26,300-dwt Maria Smith (1982). The ship at dates in the fleet of Jinngyu Ocean Shipping Co (Hong).

Last August, Samsung Logic took the ship on seven-month time charter and claims the were voluntarily terminated by the shipowner who called upon to lose bagged out of Yokohama, India, under orders from subcharterer Ahed.

The terminated charter cited Samsung to go over the related particular condition in the hull from May 28 were this passage-performance subcharter of 62-65 days from Samsung Logic, it's back-to-back disputes are subject to London arbitration.

### Mortfood claims Iranian outfit owes it more than $3m

London Mortfood Shipping is claiming it is more than $3m when Iranian en-



Marine Division